The PEOPLE of the State of Colorado, Complainant,

v.

William W. MUHR, Respondent.

No. 14PDJ021.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 13, 2016.

§ 24–51–1105, C.R.S. 2015.

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)**

## I. *SUMMARY*

Respondent engaged in misconduct in two client matters. In the first, a personal injury matter, Respondent allowed the client's statute of limitations to expire before he settled the matter or filed suit. He then directed his staff to provide the client with a settlement check and a disbursement statement reflecting a deduction of fees, liens, and costs, thereby misleading the client into believing that her case had been settled when it had not. In this matter, the Hearing Board finds that Respondent violated Colo. RPC 1.2(a), 1.3, 1.4(a)(3), and 8.4(c). In the second matter, Respondent filed a stipulated motion to dismiss his client's federal lawsuit. He did so without making reasonable attempts to communicate with the client about the motion, which publicly disclosed Respondent's adverse analysis of the client's case. Even after public filings made clear that the client had chosen to retain other counsel, Respondent reiterated his request to dismiss the client's case in a reply, only withdrawing his motion more than a month later. The Hearing Board concludes that Respondent's misconduct contravened Colo. RPC 1.4(a)(3), 1.6, and 8.4(d). We therefore impose a suspension of one year and one day, with nine months served and the remainder stayed upon a three-year period of probation, with conditions to include practice monitoring.

## II. *PROCEDURAL HISTORY*

The People filed a complaint in this case on March 7, 2014, bringing claims concerning two client matters. In the first matter (the Risley matter), the People allege violations of Colo. RPC 1.2(a) (a lawyer shall abide by a client's decision about whether to settle a matter); Colo. RPC 1.3 (a lawyer shall act with reasonable diligence and promptness in a client's representation); Colo. RPC 1.4(a)(3) (a lawyer shall keep the client reasonably informed about the status of a matter); and Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). In the second matter (the Stringer matter), the People's claims are premised on violations of Colo. RPC 1.4(a)(3); Colo. RPC 1.6 (a lawyer shall not reveal information relating to the representation); Colo. RPC 1.7(a)(2) (a law-

yer shall not represent a client where there is a significant risk that the representation will be materially limited by the lawyer's personal interest); and Colo. RPC 8.4(d) (a lawyer shall not engage in conduct that prejudices the administration of justice).

Respondent filed an answer on April 21, 2014, and the PDJ held an at-issue conference on May 2, 2014, setting the hearing in this matter for December 8 through 12, 2014. During pretrial motions practice, the PDJ quashed certain third-party subpoenas issued by Respondent to the extent those subpoenas required disclosure of privileged or other protected matter. On November 7, 2014, the PDJ denied Respondent's motion to accept the untimely expert designation of Christopher Schmidt and Belord Kunjeer, but permitted Respondent to call those individuals as fact witnesses.

On November 26, 2014, the PDJ denied Respondent's partial motion for summary judgment, in which Respondent sought entry of judgment on the claims pleaded in the Stringer matter. Viewing Respondent's motion in the light most favorable to the People, as the nonmoving party, the PDJ concluded that the undisputed facts in the case did not support entry of judgment as a matter of law on any of those claims. On December 2, 2014, the PDJ denied Respondent's motion in limine to exclude four types of evidence, as well as testimony pertaining thereto, at the upcoming hearing. The same day, the PDJ granted the People's motion to present absentee testimony of Brenda Tarkinton but denied their request to present video or telephone testimony of Janice Risley Trujillo and Kevin Stringer.

Also on December 2, 2014, the PDJ held a status conference regarding a motion filed by Reid and his firm to withdraw as Respondent's counsel. After receiving brief statements from the parties, the PDJ ordered that a presiding officer be selected for the limited purposes of convening a confidential hearing and ruling on the motion to withdraw. The PDJ's administrator selected and the PDJ thereafter appointed John A. Sadwith, Esq., a member of the hearing board pool appointed by the Colorado Supreme Court under C.R.C.P. 251.18(b), to serve as the presiding officer. Presiding Officer Sadwith held a hearing the same day, requesting that Respondent and Reid make a sealed record concerning the motion outside the presence of the People and the PDJ. After having been fully advised of the grounds for the motion to withdraw, Presiding Officer Sadwith denied the motion.

On December 4, 2014, the PDJ ruled that certain personal medical records contained in exhibit 1B to Respondent's motion in limine—portions of which would eventually be marked as Respondent's exhibit 97—should be marked as "Confidential" and suppressed from public access.

During the hearing from December 8 to 12, 2014, the Hearing Board considered testimony from Janice Risley Trujillo, Edward Farry, Jeanette Newport, Kimberly Alford Everette, Courtney Talerico (a/k/a Courtney Camelin), Jennifer Adkins, Leo Daniel Rector, Brenda Tarkinton, Kim Welch Ferrari, Jimmy Vigil, Gary Michaels, Christopher Schmidt, Linda King, Laura Huspek, Belord Kunjeer, Marizza Plaza (a/k/a Marizza Lopez), Shelley Muhr, Joseph Bronesky, Peggy Vicaro, and Respondent. The PDJ admitted stipulated exhibits S1–S42, the People's exhibits A and L–M,[2] and Respondent's exhibits 1–4, 7–8, 11, 19, 30–33, 42–43, 47–48, 54, 67, 81, 97 (suppressed), 103, 107, 114, 117, 121, 125–126, 128–129, 143, 149–151, 162, 165, 169, 218–220, 223–225, 232–233, 247–248, and 260.

Following close of evidence and final arguments, Respondent filed pro se—without assistance of Reid, his then-counsel of record—a motion to reopen the proceedings to take additional evidence. The People moved to strike his motion. He then filed an amended motion to reopen, followed by a second amended motion, which was accompanied by

---

**2.** The People's exhibit M is an affidavit executed by an investigator for the People describing a witness's out-of-court statements concerning the authenticity of another document, Respondent's proposed exhibit 262. The parties agreed that proposed exhibit 262 should be attached to exhibit M to lend context, but the Hearing Board does not consider proposed exhibit 262 as evidence in this matter.

his own entry of appearance terminating Reid's representation. Respondent also contemporaneously filed a response objecting to the People's motion to strike. On January 16, 2015, the PDJ, in consultation with the Hearing Board, struck Respondent's original and first amended motions and denied his second amended motion to reopen the proceedings.

## III. FINDINGS OF FACT AND RULE VIOLATIONS

The Hearing Board finds the following facts were established by clear and convincing evidence. Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 27, 1988, under attorney registration number 18093.[3] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[4]

Respondent, a former Army company commander, JAG prosecutor, and military judge in the national guard, established his own law practice—William Muhr, Attorneys & Counselors at Law, LLP ("the firm")—in Colorado Springs in 1988. Since then, he has practiced primarily in the field of personal injury law.

Over the past two decades, he has worked as the firm's general partner to expand its reach into other markets by affiliating with experienced out-of-state attorneys, who have contracted with the firm as limited liability partners. He has also on occasion employed associate attorneys to handle cases under his guidance and supervision, as well as a host of non-lawyer staff members, who, as one outside lawyer said, "operate[ ] as a well-oiled machine." Together, these employees are given tremendous authority, with seemingly little oversight, to process every case handled by the firm. Even so, Respondent portrayed the organization and operation of his firm using decidedly martial terms, which we infer, based on the tenor of his and others' testimony, also describe the firm's culture. Indeed, without exception, each witness who testified at the hearing recognized Respondent not only as the owner of the firm, but also, as one employee put it, the "big boss."

### The Risley Matter

■ On January 31, 2009, Janice Risley Trujillo (hereinafter "Risley") purchased a bagged salad from a King Soopers grocery store that she believed was mislabeled and that contained, unbeknownst to her, peanuts.[5] She sought treatment at a hospital in Colorado Springs, complaining of a swollen tongue and throat, which she suspected was an allergic reaction to the peanuts in the mislabeled salad.[6] She was treated for her symptoms and released a few hours later.[7]

Risley met with Respondent on February 5, 2009, and the two signed a fee agreement governing Respondent's representation of Risley in a personal injury claim against King Soopers or its affiliate entity, Kroger.[8] Respondent recalled Risley informing him that she did not want to litigate the claim, but instead wished to resolve the matter out of court with the best settlement he could achieve. Risley testified, on the other hand, that she never issued any such directive. She remembered only Respondent's advisement that her claim was worth a substantial amount and his prediction that it would be settled out of court fairly quickly. The Hearing Board credits Risley's testimony, in part because the fee agreement does not reflect any limitations on Respondent's representation. To the contrary, it details the firm's contingent fees for matters resolved after the filing of a complaint.[9] Although the Hearing Board was presented with evidence

---

3. Respondent's registered business address is 7035 Campus Drive, Colorado Springs, Colorado 80920.

4. See C.R.C.P. 251.1(b).

5. Ex. S3.

6. Ex. S3.

7. Ex. 97 (suppressed). Although Respondent questions whether Risley was genuinely allergic to peanuts, the Hearing Board takes no position on that issue, as it has no bearing on our analysis.

8. Ex. S2.

9. Ex. S2.

indicating that settlement in every case was *Respondent's* priority,[10] Respondent could not point to notes or any other contemporaneous documentation of Risley's supposed wishes. Nor do we find it likely that Risley had the legal sophistication or knowledge of dispute resolution processes to make such a request.[11]

Toward the end of February 2009, Respondent assigned Kimberly Everette, at that time a law student intern at the firm, to draft a demand letter to King Soopers and its claims adjuster, Sedgwick CMS, requesting settlement of the claim for $48,000.00.[12] Everette testified that she drafted the letter after discussing the matter with Risley and in consultation with Respondent, who instructed her to propose settlement for that sum. Everette also met Risley in person once, when Risley brought to the firm two salad containers—one properly labeled and one improperly labeled—so that the firm's staff could take pictures. Later, Everette wrote a follow-up letter to Sedgwick responding to certain questions its adjuster raised regarding Risley's claim.[13] Everette did not recall ever being asked to do additional work on the matter.

From April 2009 through December 2010, little happened in Risley's case. At Respondent's direction, the firm sent Sedgwick copies of Risley's medical records,[14] as well as a second demand letter requesting $50,000.00 to settle the claim.[15] Respondent also occasionally sent reminders to Jimmy Vigil, a newly hired associate at the firm, requesting updates about the status of the case.[16] Various client lists in 2010 assign responsibility for the Risley case alternately to "Kim/Rick"[17]—presumably referencing Everette,

at the time a case manager—and then later to "Gary."[18] Though Respondent insisted that once Everette was admitted to the bar in December 2010 she took over Risley's case as the attorney in charge, no records were admitted to substantiate his assertion. No client lists, letters to Risley, or email communiqués between Everette and Respondent document this supposed personnel change, and the Hearing Board thus declines to adopt Respondent's position.

Rather, toward the end of 2010, Brenda Tarkinton, a non-lawyer whom Respondent hired to contact claims adjusters and to negotiate settlement amounts, began work on Risley's matter. As with other negotiations Tarkinton handled, she regularly conferred with Respondent about progress toward settlement, and he approved a certain monetary range in which she could negotiate. Tarkinton described her role in the negotiations as a liaison between Respondent and claims adjusters: he would tell her what to say, and she would relay his messages to adjusters.

On January 5, 2011—less than a month before the expiry of the two-year statute of limitations on Risley's personal injury claim—Sedgwick first responded substantively to the firm's demand letters, offering $3,194.22 to settle the claim.[19] Tarkinton and Respondent testified that throughout January 2011, they both communicated regularly with Sedgwick to settle Risley's claim, each working off the same informal chart to document offers and counteroffers.[20] Tarkinton recalled having several telephone conversations with Risley during this time and specifically remembered Risley was upset with the figures being discussed. Risley con-

**10.** *See* Ex. 7, an attorney checklist that Respondent drafted, exhorting staff to "Settle!!" at each stage of a case.

**11.** Our finding also jibes with the testimony of Peggy Vicaro, an intake specialist at the firm from 2010–2013. According to Vicaro, only occasionally would she hear clients say that they did not wish to go to court, and it "wasn't very often" that clients would express opinions about how they wanted a case to proceed.

**12.** Ex. S3.

**13.** Ex. S41 at 000020–21, 000023–25.

**14.** *See* Ex. S41 at 000022; Ex. 107.

**15.** Ex. S41 at 000026–28.

**16.** Exs. 114, 117, 126 & 128.

**17.** Ex. 121.

**18.** Ex. 129 at 000412.

**19.** Ex. S5.

**20.** Ex. S5; *see also* Ex. S4.

firmed that she spoke with someone from Respondent's office on at least a few occasions.

On Friday, January 28, 2011, Tarkinton received a telephone call from Sedgwick, relaying its final offer of $8,000.00.[21] Tarkinton called Risley to convey Sedgwick's final offer, but Risley objected to the figure and refused to accept it. Tarkinton testified that "we were stuck and at an impasse at that point," so she turned over the file to Respondent to try to negotiate for another amount. Records are silent as to events, if any, that transpired that weekend or on January 31, 2011—the date the statute of limitations expired. Every witness agreed, however, that a complaint to preserve Risley's claim was never filed on her behalf.

Tarkinton exchanged calls with Sedgwick on February 2, 2011, seeking additional movement on the offer and countering with a demand of $11,000.00.[22] Sedgwick faxed a response to Respondent the same day, reiterating its final offer of $8,000.00.[23] The next day, the firm replied via letter using Respondent's stamped signature, acknowledging receipt of Sedgwick's final offer and reiterating Risley's final demand of $11,000.00.[24]

Records do not reflect any further action taken on Risley's matter until March 14, 2011, when Courtney Talerico, a non-lawyer closing specialist in charge of handling settlements and disbursements for the firm, corresponded with Health Management Systems ("HMS"), a third-party contractor for Medicaid, to ascertain whether Medicaid was entitled to assert any subrogation on Risley's liability claim against King Soopers.[25] Monique Lujan, at HMS, replied the next day that Medicaid maintained a right of recovery for the cost of medical services it had covered.[26]

On March 17, 2011, Tarkinton attempted to restart negotiations by offering $8,500.00, only to be informed by Sedgwick that Risley's statute of limitations had run.[27] Tarkinton told the Sedgwick adjuster that the firm had filed a complaint in Risley's matter to protect the statute of limitations and promised to investigate.[28] But after inspecting Risley's case file, Tarkinton realized that a complaint had never been filed. Tarkinton then approached Everette for guidance as to whether the statute of limitations might have tolled. Everette advised Tarkinton that the statute of limitations appeared to have been "blown" and directed Tarkinton to inform Respondent.[29] Everette remembered that Tarkinton "looked like she was going to pass out," so Everette volunteered to sit in on Tarkinton's conversation with Respondent.

Everette and Tarkinton together walked to Respondent's office, where Talerico was waiting to speak with Respondent. With Talerico present, Tarkinton and Everette informed Respondent that the statute of limitations had expired in Risley's case without a complaint filed to preserve the claim. According to Everette, Respondent thumbed through the file, said that he wanted the case treated as a settlement, and instructed that liens and attorney's fees should be deducted from the amount of the last settlement offer and a check cut for the remainder. Tarkinton likewise recalled Respondent expressing a desire to pay out of his own pocket the final amount offered by the adjuster and implicitly conveying the message that Risley was not to know that the statute of limitations had run. And Talerico recounted how Respondent handed

21. Ex. S41 at 000006–7.

22. Ex. S41 at 000006.

23. Ex. S41 at 000005–6.

24. Ex. S41 at 000005, 000033; Ex. 151.

25. Ex. 149.

26. Ex. 150.

27. Ex. S41 at 000001.

28. Ex. S41 at 000001.

29. According to Everette, Tarkinton told her that the firm had missed its filing deadline two or three days after the statute of limitations passed—roughly around February 3, 2011. Based on Tarkinton's and Talerico's testimony, which aligns with Sedgwick's contemporaneous notes, see stipulated exhibit 41, we conclude it is far more likely that Tarkinton discovered the statute of limitations had expired on March 17, 2011, and that her conversation with Everette occurred thereafter.

her Risley's case file, told her to get the Medicare and Medicaid liens waived, and instructed her to draft a final disbursement statement ("FDS"). Though Talerico could not remember whether Respondent explicitly forbade her from telling Risley that the statute of limitations had expired and that the case had not settled, she "walked away with that very clear understanding."

Armed with these orders, Talerico said, she set about getting the Medicaid lien waived. On April 4, 2011, she again contacted HMS's Lujan, inquiring about the lien amount.[30] Presumably Talerico received a response, because she sent Lujan a fax the same day in which she reported that "[w]e missed the filing statute on this case so there will be no settlement. We are going to pay the client out of pocket for what she WOULD have recovered, but there will be NO third party recovery in this case so can you please close your case?"[31] Talerico explained at the hearing that she did not request Medicare to waive its lien, however, because Medicare was known to copy clients on all responsive correspondence, and it was "fairly obvious" to her, based on her conversation with Respondent, that she was not to tell Risley that the firm had failed to settle the case.

Talerico then drafted an FDS documenting Risley's "gross recovery" figure of $8,000.00 and deducting costs of $369.58, fees of $2,666.67, and a "Medicare lien" of $1,785.76 from that sum, yielding a total disbursement of $3,177.99 to Risley.[32] Talerico distributed a copy of the FDS to Tarkinton,[33] who initially was tasked with calling Risley. Talerico

also coordinated with Jeanette Newport, a staff member responsible for issuing checks from the firm's trust account. Talerico informed Newport that the statute of limitations had expired in Risley's case and asked her to issue a check to Risley from the firm's operating account. Newport understood from their conversation that the collective intent was to deceive Risley. On April 14, 2011, Newport cut a check to Risley from the firm's operating account in the amount of $3,177.99.[34] The check's memo line read "Settlement."[35] Newport contemporaneously wrote an email to Respondent's ex-wife, Shelley Muhr, who was responsible for overseeing the firm's finances, explaining that Newport had just written a check to Risley because "[w]e missed the SOL on her."[36]

The same day, Talerico contacted Risley, asking her to come pick up her check and sign the FDS. Talerico recalled that Risley was not able to stop by until a week later, on April 21, 2011.[37] That day, Talerico met with Risley for just a "brief minute" to obtain Risley's signature on the FDS[38] and to hand her the check cut from the firm's operating account. Talerico remembered the meeting as "uncomfortable" because Risley was "furious, absolutely furious." Talerico "distinctly" recalled that Risley was upset with the amount of the check because she believed Respondent had guaranteed during their initial consultation that her case was worth much more. According to Talerico, Risley "didn't ask and we [the firm] didn't tell" that the case had not settled with King Soopers.

Only later—more than a year thereafter—did Risley discover that her case had not

30. Ex. 150.

31. Ex. 162.

32. Ex. S40. Stipulated exhibit 1 is an earlier iteration of the FDS, which contains $500.00 as a placeholder for the Medicaid lien, presumably pending HMS's decision whether to waive that lien.

33. Ex. S1.

34. Ex. S7.

35. Ex. S7.

36. Ex. S8.

37. Risley testified that she visited the firm on April 14, 2011, and met with Respondent then. We conclude that Risley's testimony on this point must be mistaken: Respondent was not in Colorado on April 14, 2011. See Ex. 165. Further, Risley agreed that she signed the FDS contained in stipulated exhibit 40, which is dated April 21, 2011, and Talerico's testimony corroborates the timing of that event. We also consider it very unlikely that Respondent would have met personally with Risley on April 21, 2011, as general office procedures and the testimony of both Talerico and Respondent all suggest that Risley met and talked only with Talerico.

38. Ex. S40.

been settled and that her "settlement" check had, in fact, been drawn from the firm's operating account. In autumn 2012 Risley retained Edward Farry Jr. to sue Respondent for malpractice.[39] Respondent soon offered Farry a check for $1,785.76 to compensate Risley for the Medicare lien, which he arranged to have waived.[40] Farry was later removed from Risley's case based on a conflict of interest,[41] however, and Risley ultimately stipulated to dismissal of that case with prejudice.[42]

At the disciplinary hearing, Respondent categorically disavowed the events as set forth above and instead averred he first learned from Farry in December 2012 that the statute of limitations in Risley's case had been missed. Respondent testified that he transferred responsibility for all premises liability cases—including Risley's—to Everette in December 2010, immediately after she was sworn in as a licensed lawyer. Respondent also contended that he timely instructed Everette to file a complaint in Risley's matter and that he therefore continued to bargain with King Soopers past the statute of limitations, relying in good faith on Everette's representations that she had filed the complaint. He asserted that he personally called Risley on February 2, 2011, to advise her that the adjuster's final offer was $8,000.00, news that Risley accepted without expressing dissatisfaction. Then, he said, he "bounced" the file back to Everette to close out the case and never heard anything more about the matter until he was contacted by Farry more than a year later.

Respondent also hinted that he was a victim of a coordinated effort to cover up Everette's failure to file a complaint and to frame him for the mistake instead. Respondent suggested that Tarkinton unilaterally attempted to renew negotiations with King Soopers in March 2011, after which Everette and Talerico colluded to obtain a waiver of Risley's Medicaid lien, to order Newport to issue a check from the firm's operating account, and to obtain Risley's signature on an FDS—all without Respondent's knowledge. To that end, Respondent elicited testimony from Gary Michaels, who was admitted as a expert in forensic document examination. Michaels testified that "without a doubt," a yellow-highlighted copy of an FDS signed by Risley and dated April 21, 2011, is a photocopy of a "manipulated document."[43] Michaels elaborated that the document he examined was a digital insertion of a cut-and-paste of Risley's signature.[44]

Though we have carefully considered Respondent's position, we do not adopt his version of events and cannot accord his testimony any measure of credibility. The documents and testimony all point to Respondent's and Tarkinton's considerable involvement in negotiating Risley's claim past the statute of limitations deadline, but no notes, emails, or letters show that Respondent ever requested Everette's assistance during January 2011. Indeed, the absence of any such document stands in stark contrast to the many emails Respondent sent Vigil in 2009 and 2010, checking on the status of Risley's matter.[45] We thus conclude that while Respondent may have intended to ask Everette to file a complaint, and in fact likely believed that he had done so, he neglected to make such a request and thereby was responsible for failing to preserve the statute of limitations. Accordingly, we find that Respondent violated Colo.

---

39. *See* Exs. 224–225.

40. *See* Exs. S37, 223.

41. Ex. 232.

42. Ex. 233.

43. Ex. 169 at 6.

44. The purported significance of Michaels's testimony was not made clear during closing argument. Respondent later fleshed out his hypothe-sis in pro se motions to reopen the proceedings, however, where he speculated that Farry and several firm employees—including at least one individual who did not begin work at the firm until summer 2012—all conspired to replace a genuine FDS dated April 14, 2011, with a fraudulent FDS dated April 21, 2011. Under this theory, Respondent appears to assert that he could not possibly have been responsible for the FDS because he was in Chicago on April 14, 2011. *See generally* Second Am. Mot. to Reopen Proceedings.

45. *See* Exs. 114, 117, 126, 128.

RPC 1.3, which charges lawyers to act with reasonable diligence and promptness in representing a client.

We also conclude that it was Respondent who orchestrated the scheme to cover up from Risley his inadvertent breach of the statute of limitations. We find that it was Respondent who directed Tarkinton to recommence negotiations with Sedgwick on March 17, 2011; according to Tarkinton, and as confirmed by Vigil, she never made new settlement overtures without Respondent's explicit authorization. Soon after Tarkinton's discussion with Sedgwick, Tarkinton and Everette alerted Respondent to the mistake.[46] Respondent then ordered Risley to be compensated in the amount of Sedgwick's final offer, less fees, costs, and non-waived liens, a consensus shared by Tarkinton, Everette, and Talerico—none of whom now work at the firm and some of whom now have differing agendas, loyalties, and animosities. It strains credulity to imagine that these three employees, along with at least two other individuals who would only learn of the case much later, would conspire to fabricate documents and frame Respondent. We cannot give any credence to what the People have termed Respondent's "conspiracy theory of epic proportions."

Our conclusion is also founded on five additional observations:

- First, Talerico and Newport dispatched their duties with relative transparency; Talerico informed HMS by fax that the filing statute in the case had expired,[47] while Newport, quite candidly, told Shelley Muhr in an email that the statute of limitations had been missed.[48] Neither staff member, we believe, would have carried out their assignments as forthrightly had they been attempting to conceal the operation from Respondent.

- Second, Respondent represented that the firm had on prior occasions missed statutes of limitations, and that he had compensated those clients in a manner similar to Risley. On those occasions, he said, he generally would verbally reprimand an employee for his or her role in the mistake. Given the relatively mild sanctions involved, we cannot understand what would motivate a group of staff members to concoct a complex scheme to deceive Respondent.

- Third, although Respondent distanced himself from the creation of the FDS, his manner and demeanor while testifying suggested that he believed the way in which Risley's matter was handled was not only consistent with his own prior practices but also eminently reasonable. We would not expect Respondent to have offered such a strident defense of the logic behind the FDS if he had been blindsided by its existence.

- Fourth, the People elicited testimony from Jennifer Adkins, Respondent's office manager during summer and autumn 2012. Adkins stated that while she was in Respondent's employ, they discussed Risley's malpractice claim against Respondent. Adkins testified that during their conversation, Respondent "just, ah, reinforced to me that he didn't know anything about the case and said that any documents with his writing on it needed to go away." Adkins understood from this conversation that Respondent "wanted [her] to destroy any documents with his writing on it." This testimony, at a minimum, casts doubt on Respondent's assertion that he had nothing to do with Risley's file after February 2011, and it undermines his credibility.

- Fifth, Respondent steadfastly maintained in his direct testimony that not until late 2012 did he discover Risley's statute of limitations had expired. On cross examination, however, Respondent acknowledged that he recently prepared a summary of the case for his expert witness in

---

**46.** Respondent testified that if knew the statute of limitations had been breached, he would not have engaged in negotiations on March 14, 2011, with insurance companies that were entitled to subrogate on Risley's settlement. *See* Ex. 149. As discussed above, the Hearing Board determines that in all likelihood Respondent did not discover the statute of limitations had been missed until March 17, 2011.

**47.** Ex. 162.

**48.** Ex. S8.

which he wrote that he was notified of the statute of limitations breach in April 2011. We find that these inconsistencies cast a pall over Respondent's entire account of the Risley matter.

In light of these findings, the Hearing Board concludes the People have proved by clear and convincing evidence that Respondent violated Colo. RPC 1.2(a), requiring lawyers to abide by a client's decision about whether to settle a matter. We have already rejected Respondent's assertion that Risley instructed him to settle her claim out of court for as much as he could get. Instead, we find it likely that Risley never explicitly authorized settlement at any particular figure, and that Respondent never pressed her to articulate her bottom line. Respondent was therefore required to confer with Risley to determine whether she would accept various offers. Yet even though Risley had specifically objected to Sedgwick's final offer of $8,000.00, Respondent ordered his staff to prepare the FDS as though she had. We conclude such conduct contravened Colo. RPC 1.2(a).[49]

Likewise, we find that Respondent violated Colo. RPC 1.4(a)(3), which requires a lawyer to keep a client reasonably informed about the status of a matter. Respondent's staff communicated at regular intervals with Risley concerning the status of her case and the possible settlement of her claims until the end of January 2011. Although we are concerned that Respondent did not personally communicate with Risley at any time after their initial meeting when she retained him, we do not find a violation of Colo. RPC 1.4(a)(3) by clear and convincing evidence based on this conduct. After January 2011, however, neither Respondent nor his staff communicated with Risley about the expiry of her statute of limitations or his failure to settle her case. This conduct does contravene Colo. RPC 1.4(a)(3), and we conclude

the People have proved this claim by clear and convincing evidence.

We also determine that Respondent engaged in conduct involving deceit when he directed his staff to provide Risley with a check and an FDS alluding to a fictitious settlement with King Soopers, which served to conceal his negligence in allowing her statute of limitations to expire. Compounding this misconduct, Respondent made clear to Talerico that she was not to inform Risley of the true status of the case, so Talerico felt inhibited from contacting Medicare to request that its lien be waived. Because Respondent also instructed Talerico to treat the case as settled and deduct costs, fees, and liens, the FDS reflects a non-waived Medicare lien, and thus reads as though the firm had reimbursed Medicare out of the settlement funds. Respondent's instructions and the products thereof—the FDS and the "settlement" check—misled Risley into believing, inaccurately, that King Soopers had paid to settle her case. Accordingly, we find that Respondent violated Colo. RPC 8.4(c).

### The Stringer Matter

■ Sometime in 2011, Talerico spoke with Everette about the denial of her husband's claim under The Servicemembers' Group Life Insurance Traumatic Injury Protection Program ("TSGLI"), a disability policy for active duty service members. TSGLI is designed to provide payment to service members who are severely injured on or off duty and suffer a loss as the result of that traumatic event. According to Everette, a service member could qualify for compensation for any number of reasons but, as pertinent here, a service member would be entitled to benefits if he or she were unable to independently perform at least two activities of daily living ("ADL") for a consecutive thirty-day period. As Everette explained, Talerico had observed that the military, and in

49. Respondent maintains that "[t]o the extent that this Claim [predicated on Colo. RPC 1.2(a)] refers to a client's, Ms. Risley's, decision on settlement with [Sedgwick], there never was a settlement so this Claim simply does not apply." Respondent's Hr'g. Br. at 26. We dismiss this line of reasoning as casuistic: Respondent ignored Risley's wishes and then handled the case

as settled. That Risley's case never actually settled does not vitiate Respondent's failure to respect Risley's decisions concerning the representation, but rather highlights the fact that he ran roughshod over them. *See* Colo. RPC 1.2(a) cmt. 1 (emphasizing that the client is alone entitled to determine the purposes to be served by the legal representation).

particular the U.S. Army Human Resources Command, "seemed to be rubber-stamp denying" claims; neither Talerico nor Everette could find a single instance of an ADL claim being approved for payment. Everette was not aware of any other attorney handling the issue, but believed that the trend they had observed might "shak[e] out as a class action."

Talerico and Everette brought the issue to Respondent's attention. He gave them permission to pursue the TSGLI litigation and to bring in outside attorney Dan Rector as co-counsel with class action expertise. Talerico, who described the TSGLI litigation as "her baby," set about looking through the firm's files to determine whether any other client could qualify under TSGLI. She was also instructed to begin looking for a named plaintiff with Colorado residency to satisfy the requirements for venue in the federal district court of Colorado.[50] Talerico soon identified as a lead plaintiff Kevin Stringer, a Colorado resident who had retained the firm to seek recovery for injuries he sustained in a 2009 automobile accident.[51] Stringer signed a TSGLI fee agreement with the firm on August 18, 2011,[52] and a power of attorney on September 6, 2011, authorizing the firm to act as his agent with regard to his claim and any appeals in the TSGLI litigation.[53] Everette testified that as a matter of course every client signed a power of attorney so that the firm could deposit settlement checks without obtaining the client's signature.

Talerico and Everette assisted Stringer in submitting his initial TSGLI claims application to the U.S. Army, including his "Part B," a certification of injury by a medical professional. When Everette reviewed Stringer's Part B, she noticed that the doctor's notations created some "ambiguity," but felt confident that the form nevertheless supported Stringer's claim. Talerico also described the form as "conflicting," since the doctor checked certain boxes signifying Stringer's loss of four ADLs, but also commented in the margin of the form, "P is able to perform listed ADLs."[54] Stringer's application was received on September 12, 2011, denied on September 26, 2011, and returned to Stringer on September 29, 2011.[55] Everette testified that the U.S. Army claimed to have reviewed more than 1,000 pages of Stringer's medical records on "three levels," yet it "turned around" his application in seventy-two business hours.

Around the same time, Rector, Talerico, and Everette worked together to draft a class action complaint, which ultimately included Stringer as one of five named plaintiffs.[56] The complaint was filed in federal district court on October 3, 2011.[57] Although Respondent was included in the team's correspondence and was listed in the complaint's signature block as an attorney for the plaintiffs, he acknowledged that he was not paying attention to the TSGLI litigation. As Talerico recounted, Rector "handled everything."

Everette and Vigil formally entered their appearances on October 19, 2011.[58] Along with Talerico, they worked with Rector to move the case forward. In February 2012, Stringer authorized the U.S. Army to disclose his personal information by publicly filing his administrative record in the TSGLI litigation.[59] His administrative record, including his Part B medical certification, was publicly filed with the court on April 24,

---

**50.** *See* Ex. S11 at 003729; Ex. 19.

**51.** Stringer's wife, Selda, had also earlier retained the firm in her role as her son's representative in a probate matter arising from the same accident. She was still a client at the time Stringer was selected as lead plaintiff.

**52.** Ex. S9.

**53.** Ex. S10.

**54.** Ex. S16 at 000012–13.

**55.** Ex. S16 at 000004.

**56.** *See* Exs. S11–S13; Ex. 260. Rector explained that TSGLI claimants were not required to exhaust administrative remedies following their denials, but rather were entitled to seek immediate relief in federal court.

**57.** Ex. S13.

**58.** Ex. S14.

**59.** Ex. S15.

2012.[60]

Respondent terminated Talerico's employment at the end of July 2012, after Talerico tendered notice that she would soon resign. In mid-August 2012, Everette and Vigil announced they would also depart the firm to open a new practice together, effective thirty days hence, on September 14, 2012. According to Respondent, Everette and Vigil informed him they would open a collections practice and did not intend to take clients with them.[61] Respondent promptly posted advertisements and conducted interviews for new staff members, ultimately hiring attorneys Kim Welch Ferrari and Saira Malik, TSGLI case manager Marizza Plaza,[62] paralegal Linda King, office manager Jennifer Adkins, and bookkeeper Laura Huspek.

With the help of this new personnel, Respondent began to review client files, including those of the TSGLI claimants. Emails from the firm went out to all TSGLI clients around August 27, 2012, including to Stringer at stringersk@yahoo.com, requesting updated contact and medical information for the firm's database.[63] As Respondent explained, the purpose of this email was to get him and his new staff up to speed and knowledgeable about each case in the wake of Everette and Vigil's departure. Respondent also directed King to call all of the TSGLI clients to update the status of their cases; King "started with the As working [her]self down the alphabet" in the last days of August 2012.[64]

Also around that time, Everette mailed to her clients notices of her departure from the firm. According to King, this created "a mess, to be completely honest. There was a

lot of confusion. The clients were completely baffled as to what was going on." As Respondent recalled, the firm received "a flood of calls from clients" inquiring about the changes. To combat the confusion, Respondent circulated to clients another email on the morning of September 3, 2012, in which he explained that Everette and Vigil were obligated to transition the handling of each client's file prior to their departure from the firm.[65] That email was also sent to Stringer at stringersk@yahoo.com.[66] Later that day, Everette sent an email to TSGLI clients, including to Stringer at stringersk@yahoo.com, to inform those clients of their right to choose their own counsel.[67] Everette testified that in her view, Respondent's email failed to make clear that the TSGLI clients had a choice in their representation, and she wanted to explain their options, including the option of retaining her and Vigil.

Two days later, on September 5, 2012, Respondent ordered his IT technician Belord Kunjeer to send another email to his client list.[68] In this email, each client was asked to respond by "simply replying YES" if the client wished for Respondent and his firm to continue the representation.[69] This email was sent to stringersk@yahoo.com; Kunjeer received a response thirty minutes later from "Selda Springer" at the same email address that read, simply, "No."[70] Kunjeer said he likely did not give this email to Respondent at the time it was received, though Plaza testified that she assumed she would have done so in an effort to "keep [Respondent] informed of everything TSGLI-related." Meanwhile, according to Everette, Stringer

---

60. Ex. S16.

61. Whether this testimony accurately describes their discussion is immaterial for our purposes, save to note that Everette and Vigil's separation from the firm was acrimonious and spawned litigation that eventually resulted in a confidential settlement between Respondent and his former associates. See Ex. 81.

62. Plaza received a law degree in 2004 but has not been admitted to the bar of any state.

63. Ex. S17.

64. Ex. 43.

65. Ex. 48.

66. Ex. 48.

67. Ex. S18.

68. Respondent authorized Kunjeer to send out the email to his clients because Respondent wanted all the responses in one inbox, and, as Respondent acknowledged, he had a reputation of maintaining an overloaded email inbox.

69. Ex. S19.

70. Ex. S19.

called her to tell her that he would retain her as his attorney when she left the firm.

By September 10, 2012, Respondent had reviewed Stringer's file and determined, based largely on Stringer's Part B medical certification, that Stringer did not qualify for TSGLI payments.[71] He emailed Rector to relay his concerns,[72] and he set up a meeting with Rector, Plaza, and King for September 11, 2012. Respondent did not invite Everette. King recalled that at this meeting, Respondent "right away" pointed to Stringer's claim as "frivolous."

Respondent did, however, briefly meet with Everette about Stringer's case.[73] During this meeting, Everette testified, Respondent opined that Stringer's claim was not viable. Everette said she explained to Respondent that his concerns were unfounded and that Stringer had elected to retain her as counsel. Respondent, on the other hand, disputed that Everette told him of Stringer's plans to keep Everette as his lawyer. Respondent instead testified that during the meeting he asked Everette to contact Stringer on his behalf to discuss protecting the administrative record. Considering each witness's motive, state of mind, and demeanor while on the stand, we credit Everette's testimony on this score. Both Respondent and Everette agreed that they spoke briefly about Respondent's concerns regarding Stringer's record. We consider it highly improbable that during this conversation, Everette would have neglected to mention Stringer's decision to retain her as counsel— a decision he apparently made no later than September 5, 2012.[74]

On Friday, September 14, 2012—Everette and Vigil's last day at the firm and the day Respondent served them with a civil lawsuit alleging various business torts[75]—Respondent directed King to contact Rector and arrange to withdraw from Stringer's case on the grounds that it lacked "legal bases to proceed."[76] In a reply email, Rector questioned the wisdom of withdrawing while he was preparing the class certification motion.[77]

Sometime during that day Respondent's thinking shifted, and he determined that the better course of action would be to stipulate to a voluntary dismissal of Stringer's claim without prejudice. Respondent testified that this strategy would divest the federal court of jurisdiction and pave the way to reopen the U.S. Army's administrative proceeding so that Stringer's record could be supplemented with additional information. Accordingly, Respondent instructed Welch Ferrari, who she said was only "peripherally" involved in the litigation, to try to obtain the Assistant U.S. District Attorney's consent to the voluntary dismissal, which she received in the early morning of Monday, September 17.[78]

At the time Welch Ferrari contacted the District Attorney, neither Respondent nor anyone on his staff had obtained authorization from Stringer to dismiss the claim. Respondent testified that Stringer could not be reached during this critical period, despite Respondent's purported instructions to no fewer than three people—King, Plaza, and Everette—to call him. Yet only King specifically remembered Respondent having given this order; King recalled trying to call Stringer once, right before the stipulated motion to dismiss was filed.[79] No documen-

---

71. *See* Exs. S20, S30 ¶ 4.

72. Ex. S20.

73. The first documented mention of Respondent's concerns about Stringer's record is an email to Rector dated September 10, 2012. *See* Ex. S20. We therefore assume Respondent and Everette's meeting post-dated that email and post-dated Stringer's decision to retain Everette.

74. *See* Ex. S19.

75. *See* Ex. 81.

76. Ex. S21.

77. Ex. S21.

78. Exs. S22, S24.

79. Respondent points to exhibit 67, Plaza's worklog for September 17–19, as evidence that he likely requested Plaza to contact Stringer regarding the voluntary dismissal motion. But Plaza's records nowhere indicate that she was ordered to call Stringer or that she actually did so. Plaza's worklog notes are so punctilious—for example, they refer to attempted calls and emails Plaza exchanged with other clients—that we view the absence of any such note memorializing an attempt to contact Stringer as reliable evidence that she in fact did not try to call him. We

tary evidence was introduced to show that Respondent or his staff ever attempted to contact Stringer by email, by letter, or in person to discuss the dismissal.

Joseph Bronesky, ethics counsel at Sherman & Howard, LLC, testified that Respondent called him around this time to seek his advice. As Bronesky related, Respondent said that he could not contact Stringer, whose administrative record was defective and would have to be sent back to the U.S. Army. Respondent portrayed the situation as urgent, Bronesky recalled, and he insinuated that action had to be taken to protect Stringer's interests within a day or two. The two men did not discuss what measures Respondent had taken to get in touch with Stringer. Bronesky told Respondent that in the absence of a suitable legal alternative, Colo. RPC 1.4 permitted Respondent to act without consulting Stringer. Bronesky estimated that the conversation lasted less than six minutes.

On the morning of September 17, Respondent and Welch Ferrari entered their appearances in the TSGLI litigation.[80] They then filed a "Stipulated Voluntary Motion for Dismissal Without Prejudice." [81] The motion stated in pertinent part:

> At this time it appears as if we are without sufficient facts to satisfy the activities, based on the Physician's statement and recent report of daily living requirements or other requirements that would be necessary for seeking payments of TSGLI benefits on behalf of Kevin Stringer. However, in the future certain facts may be developed to warrant such TSGLI claim for Mr. Stringer.[82]

Soon thereafter on September 17, Everette entered her appearance as Stringer's counsel [83] and filed a response objecting to the voluntary dismissal, asserting that Stringer's claims were meritorious and that he had not authorized Respondent to dismiss them.[84] Everette also requested that the court sanction Respondent for filing a frivolous and groundless motion.[85]

On September 18, Respondent received a letter from Everette in which she informed him that Stringer had retained her to litigate his TSGLI claim.[86] Notwithstanding this letter and Everette's earlier entry of appearance, Respondent directed his staff to prepare and send Stringer's appeal letter to the U.S. Army, requesting to reopen Stringer's claim and to supplement the administrative record.[87] A week later, Respondent filed a motion for leave to reply, along with a reply to Everette's response.[88] Respondent's reply contained the following:

> Our staff reviewed the file of Plaintiff Stringer the week of September 10, 2012, and concluded that the administrative record shows that Mr. Stringer's treating medical doctor, including a treating neurologist, completed Form B, Physician's Statement, certifying that that Mr. Stringer clearly had *no* Activities of Daily Living Restrictions.... Based on the certifications by the treating neurologist, submitted to the Army on Form B of Mr. Stringer's application for TSGLI benefits, the Army properly denied Mr. Stringer's claim for [TSGLI] Benefits. Therefore, Mr. Stringer had not met the requirements for TSGLI benefits when his application for benefits was reviewed by the Army and

also consider it reliable evidence that Respondent did not instruct Plaza to call Stringer, as Plaza struck us as a conscientious employee who would have promptly executed such a task if it had been requested of her.

80. Exs. S25, S27.

81. Ex. S28.

82. Ex. S28.

83. Ex. S26.

84. Ex. S42. Stipulated exhibit 29, an email Stringer penned to Everette on the afternoon of September 17, expressly denies authorizing Re-

spondent to dismiss his case. The email came not from the email address stringersk@yahoo.com, but instead from an aol.com email account.

85. Ex. S42.

86. Ex. 30.

87. Ex. 31. The appeal letter did not go out until at least 3:00 that afternoon. *See* Ex. 67 at 000218–19.

88. Exs. S30–S31.

denied.... Accordingly, it was the undersigned's conclusion, that our claim for his benefits previously filed by our Firm in Federal District Court did not yet satisfy the requirements of F.R.C.P. Rule 11, since [the] factual contentions in Mr. Stringer's Complaint seeking TSGLI did not seem to have adequate evidentiary support at this time.[89]

In this reply, Respondent represented that Stringer's administrative appeal deadline was September 18, 2012.[90] This representation was not accurate: Respondent testified that the appeal deadline was actually September 28, 2012. Though Respondent acknowledged in the reply that Stringer had selected Everette as his counsel, Respondent again moved to voluntarily dismiss Stringer's claim with the proviso that Stringer "be allowed to re-file the Complaint with his new counsel if he wishes to do so." [91]

The next day, September 27, Everette filed a response to Respondent's motion for leave to reply. In that pleading, she emphasized that the issue was not who represented Stringer on September 17, but rather that Respondent failed to consult with Stringer before filing the voluntary motion to dismiss.[92] Everette renewed her request for attorney's fees.[93] Senior District Judge Richard P. Matsch issued an order the same day directing Respondent, Everette, Rector, and Stringer to attend a hearing concerning Stringer's representation.[94]

The hearing was set for November 1, 2012.[95] Rector remembered that at some point he "prevailed upon" Respondent to withdraw his motion to dismiss by explaining that the disagreement made "everyone look[ ] stupid" as they attempted to get a class certified—the very time they needed to

demonstrate they were "competent and capable of handling something of that magnitude." Thus, a week before the hearing—but a full month after the court's order setting the hearing—Respondent submitted a notice of withdrawal of the stipulated motion for voluntary dismissal and moved to withdraw as Stringer's counsel.[96] Respondent acknowledged in these pleadings that Stringer was represented by Everette as of September 18,[97] but he defended his decision to file the administrative appeal for Stringer "on the deadline that it was due, September 18, 2012." [98] As discussed above, this representation was not accurate.

Everette responded to Respondent's motion to withdraw as counsel, stating that his motion contained "fundamental false" assertions of fact and asserting that Stringer believed the motion had been "malevolently filed by [Respondent] to punish [Stringer] for choosing other counsel and was not a mere mistake." [99] On October 29, the court vacated the hearing on the matter and granted Respondent's motion to withdraw as counsel without comment.[100]

As Everette recounted, Judge Matsch ordered that just one TSGLI case—Ryan O'Neill's—should move forward, with the remainder stayed. Judge Matsch ultimately concluded that the U.S. Army had failed to provide a reasoned explanation for its denial of O'Neill's benefits and remanded the matter to the U.S. Army for further consideration, which was to include an opportunity for O'Neill to respond to any asserted deficiencies in the documentation by submitting other relevant materials.[101] The court thereafter remanded the claims of all the other TSGLI plaintiffs, including Stringer's, so that the U.S. Army could reconsider those claims

89. Ex. S30.

90. Ex. S30.

91. Ex. S30.

92. Ex. S33.

93. Ex. S33.

94. Ex. S32.

95. *See* Ex. S34 ¶ 9.

96. Exs. S34–S35.

97. Ex. S34 ¶ 4, Ex. S35 ¶ 9.

98. Ex. S34 ¶ 5.

99. Ex. S36.

100. Ex. 32.

101. Ex. S38.

in light of the court's guidance.[102] Everette lauded this development as one that obligated the U.S. Army to identify deficiencies in Stringer's record and that allowed Stringer to respond to those concerns, including by supplementing his record. Rector also noted that following this decision, the plaintiffs moved for and were awarded attorney's fees.

The People allege that by failing to consult with Stringer before filing the stipulated motion for voluntary dismissal, Respondent violated Colo. RPC 1.4(a)(3), which requires a lawyer to keep a client reasonably informed about the status of a matter. Respondent disagrees. During closing argument, defense counsel argued that Respondent should be "commended" for the effort he made to reach Stringer. Respondent instead faults Stringer for neglecting to provide him with updated contact information and for failing to return his calls. Relying on the "exigency exception" outlined in comment 3 to Colo. RPC 1.4, which permits attorneys to act without prior client consultation when an immediate decision must be made, Respondent maintains that the appeal deadline's imminent approach justified his failure to consult with Stringer. Finally, he points to his decision to seek dismissal of Stringer's claims as a strategic litigation choice that he was permitted to make under the power of attorney Stringer signed.

We find that the People have proven by clear and convincing evidence Respondent failed to keep Stringer reasonably informed about the status of his matter. Respondent—not Stringer—owed a duty to communicate, yet Respondent failed to ensure that he and his staff made reasonable efforts to do so. Only one of Respondent's employees testified that he instructed her to contact Stringer—right before the stipulated motion to dismiss was filed. Respondent conceded that he made no attempt to call Stringer personally. No evidence was introduced to demonstrate that Respondent or his staff attempted to contact Stringer about the dismissal at stringersk@yahoo.com or any other email address.[103] Respondent did not send anyone to Stringer's house, nor did he call Stringer's doctor for updated information. And Respondent did not testify as to any alternative methods that he or his staff employed to locate Stringer. These meager efforts do not qualify as reasonable under the circumstances and do not satisfy Respondent's obligations under Colo. RPC 1.4(a)(3).

We also reject Respondent's factual contention that he faced an exigent circumstance requiring him to dismiss Stringer's claim without first consulting the client. Respondent reached a conclusion that Stringer's claim was meritless by September 10. The deadline to reopen Stringer's administrative record was September 28. Respondent therefore had nineteen days from the date he formed his opinion to the time he was required to take action. In our view, this does not constitute an exigent circumstance. Nor does the fact, as Respondent advances, that a series of procedural hurdles—garnering opposing counsel's consent, filing a motion in federal district court, and waiting for that motion to be granted so that subject matter jurisdiction would not rest in two fora—stood between decision and implementation. F.R.C.P. 41(a), as well as Respondent's own conduct, belies this argument, since he did not wait—and need not have waited—for a ruling on his September 17 motion before requesting an appeal with the U.S. Army on September 18.[104]

Further, Respondent's reliance on Bronesky's advice lacks force as a justification for his conduct. Respondent's representations led Bronesky to believe that the administrative appeals deadline was looming, but those representations—just like Respondent's similar representations in his later filings in fed-

102. Ex. S39.

103. For this reason, we disregard Respondent's cavil that Stringer failed to provide him with updated contact information or his aol.com account, an argument that might have swayed us if he or his staff had unsuccessfully attempted to contact Stringer by email.

104. F.R.C.P. 41(a)(1)(A)(ii) allows a plaintiff to voluntarily dismiss an action without a court order by filing a stipulation of dismissal signed by all parties who have appeared.

eral district court [105]—were inaccurate. We are therefore not persuaded that, because Respondent acted on the advice of his ethics counsel, he is shielded from discipline for failing to consult with Stringer before filing the stipulated dismissal.

Next, Respondent defends his failure to speak with Stringer by pointing to the broad language of the power of attorney, which conferred on the firm the right to represent Stringer "in all and any manner which may be necessary or relevant to adjudication of [his] claim." [106] Respondent reasons that this authorization allowed him to move for dismissal of Stringer's claim, particularly when read in conjunction with comment 3 to Colo. RPC 1.2(a), which recognizes that clients may authorize lawyers to take specific actions without further consultation, and with C.R.S. section 15–14–714(1)(a), which requires agents to act in their principal's best interests. But we decline to adopt Respondent's construction of Stringer's power of attorney. Most saliently, no specific provision in the document grants Respondent the right to dismiss Stringer's claim, perhaps because, as Everette persuasively claimed, the power of attorney was intended merely to empower the firm to deposit settlement checks. We are also wary of interpreting attorney-client agreements in a way that effectively waives attorney duties and client protections set forth in our ethics rules. This determination is supported by C.R.S. section 15–14–714(2)(c), which provides that except as otherwise provided in the power of attorney, agents must "act with the care, competence, and diligence ordinarily exercised by agents in similar circumstances." We read this language as importing to Respondent under Stringer's general power of attorney the same standard of conduct outlined in Colo. RPC 1.4.

Finally, we turn to Respondent's characterization of his choice to dismiss Stringer's case as a strategic litigation decision and thus one that did not require client consultation. This argument appears to draw on comments to Colo. RPC 1.2, which place in the hands of attorneys all matters of strategy, including the means by which a client's objectives are to be accomplished. But the plain language of Colo. RPC 1.2 requires an attorney to consult with the client about those means and, in fact, explicitly refers to the mandates of Colo. RPC 1.4. Whether a decision to voluntarily dismiss a claim without prejudice is properly deemed the client's or the attorney's, then, an attorney must inform the client of the status of the matter and consult with the client about the decision. We therefore conclude Respondent's failure to discuss the dismissal with Stringer violated Colo. RPC 1.4(a)(3).

The People's next claim charges Respondent with violating Colo. RPC 1.6, a prohibition against lawyers revealing information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is otherwise permitted by the rule. The People contend that in his stipulated motion to dismiss and his reply in support, Respondent improperly revealed his own work product analyzing Stringer's Part B and deeming Stringer's claims meritless.

Respondent asserts that this claim cannot succeed for several reasons: (1) he did not reveal confidential information and never disclosed anything that was not already evident from a review of the administrative record; (2) Welch Ferrari had already discussed the firm's analysis of the merits of Stringer's claims with government counsel when she sought to stipulate to the voluntary dismissal; (3) Colo. RPC 1.6(b)(3)–(4) permitted him to disclose his analysis to prevent Stringer from committing a fraud on the court; (4) Colo. RPC 1.6(b)(6) authorized the disclosure so that he could defend against the "personal attack" Everette lodged against him in her reply; [107] and (5) the power of attorney authorized him to reveal the information because the disclosure was in Stringer's best interests.

Colo. RPC 1.6 "applies not only to matters communicated in confidence by the client but

---

**105.** *See* Exs. S30, S34.

**106.** Ex. S10.

**107.** Respondent's Hr'g Br. at 16.

also to all information relating to the representation, whatever its source." [108] Though authorities differ as to whether a lawyer is permitted to reveal information generally known to all members of the public,[109] they appear consistent in noting that disclosure of the attorney's work product, without authorization, contravenes the attorney's duty of confidentiality.[110] Certainly, we have not located any legal authority that carves out an exception to a lawyer's duty of confidentiality for previously-revealed information [111] or self-evident analysis. Accordingly, Respondent's first two defenses are specious; the rule deems immaterial whether another attorney could have replicated Respondent's analysis based on the administrative record or whether the information had already been disclosed by Welch Ferrari.[112]

We also dispense with Respondent's argument that Colo. RPC 1.6(b)(3) and (4) authorized his disclosure. Those exceptions only

apply, by the plain language of the rule, when a client's fraud is reasonably certain to result in "substantial injury to the financial interests or property of another." [113] Stringer's claims cannot be said to fit this description.[114]

We likewise refuse to accept that Respondent's conduct was authorized under Colo. RPC 1.6(b)(6). His initial motion contains some analysis of Stringer's Part B, which was entirely unnecessary: F.R.C.P. 41(a)(1)(A)(ii) allows a plaintiff to voluntary dismiss an action without a court order by filing a stipulation of dismissal signed by all parties. And though Respondent may have been entitled under Colo. RPC 1.6(b)(6) to respond to Everette's claim that he filed a "frivolous and groundless motion," [115] he had a corresponding obligation to disclose only that which was essential to rebut Everette's allegation.[116] In our view, this did not re-

**108.** Colo. RPC 1.6 cmt. 3.

**109.** *Compare* Restatement (Third) of the Law Governing Lawyers § 59 (2000) (concluding that the definition under Model Rule 1.6 of "confidential client information" excludes "information that is generally known") *with, e.g., In re Anonymous*, 654 N.E.2d 1128, 1129 (Ind.1995) (concluding that a lawyer violated Rule 1.6 by disclosing information related to a client representation, even though the information "was readily available from public sources and not confidential in nature"); *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850, 860 (1995) ("[t]he ethical duty of confidentiality is not nullified by the fact that the information is part of a public record or by the fact that someone else is privy to it"); *In re Harman*, 244 Wis.2d 438, 628 N.W.2d 351, 360–61 (2001) (concluding that a lawyer's dissemination of a client's medical records without her consent violated client-lawyer confidentiality, even though those records had been made a part of a medical malpractice action).

**110.** *See* Restatement (Third) of the Law Governing Lawyers § 59 (2000) (noting that the "expansive and unitary notion" of information relating to representation of a client includes "work product that the lawyer develops in representing the client"); *see also* Legal Ethics, Lawyer Deskbook Prof. Resp. § 1.6–1 (2013–2014 ed.) ("For information to be considered confidential it is not necessary that the source of the information be the client; it is only necessary that the information be gained in the professional relationship.") (quotations omitted).

**111.** To the contrary, the *McGraw* court rejected the respondent lawyer's defense that the informa-

tion he disclosed had been previously revealed, noting, "Clearly, respondent has confused the evidentiary attorney-client privilege with the ethical duty of attorney-client confidentiality." 461 S.E.2d at 861.

**112.** Respondent's argument on this score is particularly disingenuous: Welch Ferrari acted at his behest when communicating with opposing counsel. To the extent she revealed any of his analysis to opposing counsel—and we have no evidence to support such a finding, anyway, *see, e.g.,* Ex. S22—she did so at Respondent's direction.

**113.** Colo. RPC 1.6(b)(3).

**114.** Nor do we believe that Stringer had a "purpose to deceive" the federal tribunal, as fraud is defined in Colo. RPC 1.0(d). Respondent speculates that Stringer fraudulently filed his claim in order to establish venue in Colorado for the TSGLI litigation, but this makes no sense, for two reasons. First, it was Talerico (not Stringer) who, at the direction of Rector, identified Stringer as a candidate for lead plaintiff. Second, another of the named plaintiffs—O'Neill—also had Colorado residency. *See* Ex. S13 at 0103.

**115.** Ex. S42.

**116.** *See* Colo. RPC 1.6 cmt. 14; *see also, e.g., In re Bryan*, 275 Kan. 202, 61 P.3d 641, 655–56 (2003) (concluding that a lawyer's many disclosures of adverse information about his former client were not reasonably necessary to defend against the client's accusations that the lawyer

quire a lengthy analysis of Stringer's Part B; a brief motion to withdraw the voluntary dismissal would have sufficed. Moreover, Respondent did not take any measures to persuade Stringer or Everette "to take suitable action to obviate the need for disclosure," and he never petitioned Judge Matsch for a protective order or made other arrangements to disclose his analysis "in a manner that limit[ed] access to the information."[117] In short, Respondent's disclosures were overbroad, largely unnecessary, and done without appropriate precautions to prevent release of his damaging work product to opposing counsel.

For those reasons, we do not hesitate to reject Respondent's final contention: that the power of attorney allowed him to disclose his analysis. As noted above, C.R.S. section 15-14-714, governing the duties of agents who enter into power of attorney agreements, requires agents to act in their principals' best interests. We agree with the People that disclosure of Respondent's work product analysis was not in Stringer's best interest. That disclosure, as the People observe, revealed a substantive basis the U.S. Army might have used to dismiss Stringer's claims. Respondent could have achieved the same objective without making public what he perceived to be the weaknesses in Stringer's case. Accordingly, we find that Respondent violated Colo. RPC 1.6.

The People's third claim in the Stringer matter is premised on Colo. RPC 1.7(a)(2), which forbids lawyers from representing a client if there is a concurrent conflict of interest, where there is a significant risk that a personal interest of the lawyer will materiality limit the representation. The complaint

pleads that Respondent violated this rule because his representation of Stringer was materially limited by his own personal interest in protecting himself from F.R.C.P. 11 sanctions for filing a frivolous or meritless claim. Respondent counters that such an interpretation of the rule is absurd, as it would automatically lead to a conflict of interest whenever a lawyer acts to correct a possible F.R.C.P. 11 violation. He also disputes that his primary concern was avoidance of sanctions.

The Hearing Board adopts Respondent's legal argument; the specter of discipline should not loom whenever lawyers seek to remedy pleadings that they believe may fall afoul of Rule 11. We also concur that the People have not clearly and convincingly proved Respondent's representation was materially limited by his personal interest in avoiding sanctions. Nothing in the TSGLI pleadings—or the testimony elicited at the hearing—suggested that Respondent was motivated by concerns stemming from his F.R.C.P. 11 obligations. Rather, as discussed below, we lean toward Stringer's interpretation of Respondent's motive for dismissing the claim: that Respondent filed the motion to spite Everette and to "punish [Stringer] for choosing other counsel."[118] But the People's complaint did not set forth these grounds clearly or with particularity, nor did they advance that basis as a conflict of interest at the hearing.[119] We therefore cannot find that the People have proved their Colo. RPC 1.7(a)(2) claim, as pled in the complaint.

Finally, the People allege Respondent violated Colo. RPC 8.4(d), a rule enjoining lawyers from engaging in conduct that preju-

was stalking her); *Lawyer Disciplinary Bd. v. Farber*, 200 W.Va. 185, 488 S.E.2d 460, 465 (1997) (finding that a lawyer's motion to withdraw and an attached affidavit went beyond the type of information appropriate to the termination of an attorney-client relationship).

**117.** Colo. RPC 1.6 cmt. 14; *see also, e.g., In re Gonzalez*, 773 A.2d 1026, 1032 (D.C.2001) (imposing sanctions on lawyer who, when withdrawing from a representation, did not submit confidential information related to the representation in camera or make appropriate redactions of the material most potentially damaging to his

clients); *Spratley v. State Farm Mut. Auto. Ins. Co.*, 78 P.3d 603, 610 (Utah 2003) (noting that lawyers have a duty to minimize disclosures and should request that trial courts use tools at their disposal to carefully limit disclosures).

**118.** Ex. S36.

**119.** *See* C.R.C.P. 251.14(a); *In re Ruffalo*, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (noting that a lawyer cannot be disciplined for misconduct that was not charged in the complaint); *In re Green*, 11 P.3d 1078, 1088 (Colo.2000) (same).

dices the administration of justice. The People reason that by failing to consult Stringer before seeking to dismiss his claim, and by persisting in that request after receiving formal notice that Stringer had retained Everette, Respondent wasted court time and judicial resources. Respondent protests that it was Everette who prejudiced the administration of justice by pursuing a frivolous claim for two years, and he contends that his actions were beneficial to the administration of justice insofar as the ultimate disposition of Stringer's case mirrored the "exact relief" he first proposed.[120]

We find that Respondent's conduct did, in fact, contravene Colo. RPC 8.4(d). By September 14, 2012, Everette informed Respondent that Stringer had retained her to litigate the TSGLI claims.[121] Despite this notice, Respondent filed a stipulated motion to dismiss Stringer's claims. Everette then filed an entry of appearance and mailed Respondent notice of her retention, yet he proceeded to request that the U.S. Army reopen Stringer's administrative record. Perhaps most egregious, Respondent again requested dismissal of Stringer's claims in his reply, even after Everette entered her appearance and represented in a court filing that Stringer wished to continue to litigate those claims. And for a full month thereafter Respondent did not request to withdraw his motion or move to withdraw as counsel. In view of these facts, we are compelled to conclude that Respondent filed his motion and reply to undermine Stringer's claims, abusing the court system in the process.

Everette's conduct is not at issue in these proceedings, and we need not engage in a detailed discussion of the merits of Stringer's Part B. For our purposes, it is enough to determine that Respondent's proposed disposition—a voluntary dismissal of Stringer's claims, followed by an administrative appeal—was not identical to the ultimate outcome—a finding that the U.S. Army had acted arbitrarily and capriciously in processing TSGLI claims, with instructions on remand that the U.S. Army provide reasoned explanations for its decisions. Without that court mandate, Stringer's claim might well have been perfunctorily denied once again, and attorney's fees would likely not have been awarded.[122]

## IV. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[123] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent acted in dereliction of his duties of diligence, communication, and candor to his client Risley. In the Stringer matter, Respondent did not act in his client's best interests when he failed to communicate with Stringer and failed to preserve confidential information. Respondent also disregard-

---

120. Respondent's Hr'g Br. at 21.

121. Though the People suggest Stringer's September 5, 2012, email also alerted Respondent that Stringer no longer wished for the firm to represent him in the TSGLI litigation, we cannot find by clear and convincing evidence that Respondent received that email and therefore do not rely on that email to make our findings. Nevertheless, we find that Respondent *should have* known of this email, even if he did not: he personally arranged for Kunjeer to send inquiries to his clients requesting confirmation of his con-

tinued representation, and he ought to have instructed Kunjeer to immediately give him every response.

122. Respondent testified, in fact, that he anticipated this outcome: he imagined that a resubmission to the U.S. Army would yield a denial in approximately twenty-one days, after which he could bring Stringer's case back before Judge Matsch.

123. *See In re Roose*, 69 P.3d at 46–47.

ed his duty as a legal professional to facilitate the effective administration of justice.

*Mental State:* We conclude that Respondent negligently overlooked Risley's statute of limitations, but knowingly failed to abide by her decision whether to settle her case. He also knowingly avoided communication with Risley regarding his failure to settle her claim and his failure to preserve her statute of limitations. Finally, Respondent knowingly instructed his staff to conceal from Risley that her statute of limitations had expired.

We find that Respondent knowingly failed to communicate with Stringer before filing the voluntary dismissal, recklessly disclosed confidential information related to Stringer's case in that voluntary dismissal,[124] and knowingly prejudiced the administration of justice by renewing his request to dismiss Stringer's claims despite Everette's entry of appearance.

*Injury:* Respondent caused Risley actual injury by allowing the statute of limitations to run on her claim without preserving it, thereby depriving her of the choice of whether to litigate her case. In so doing, he also caused Risley potential injury by eliminating the possibility that she might achieve a better result, whether through settlement or trial. In a less tangible but no less important sense, Respondent's deception undermined the trust implicit in the lawyer-client relationship, as well as the public's confidence in the legal system, resulting in injury to Risley and to the legal profession. As the Colorado Supreme Court observed, "[l]awyers serve our system of justice, and if lawyers are dishonest, then there is a perception that the system, too, must be dishonest. Certainly, the reality of such behavior must be abjured so that the perception of it may diminish."[125] Indeed, Risley testified, "I trusted he would settle my case and [ ] be honest with me, and he was neither." Risley said she thought Respondent should be held accountable for failing to do what he was hired to do.

Respondent's failure to keep Stringer updated about the plan to voluntarily dismiss his claims had the potential to jeopardize Stringer's claims or otherwise harm him. Had his claims been dismissed, Stringer would have needed, at a minimum, to refile his claims in federal district court. Respondent also caused Stringer and the legal profession actual injury when he publicly revealed confidential information related to the representation; his failure to safeguard his adverse work product analysis undercut public faith in the lawyer-client relationship, the keystone of which is preservation of a client's confidences. Finally, Respondent caused the legal system actual harm by unnecessarily protracting court proceedings concerning Stringer's representation for more than a month.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Suspension is the presumptive sanction for Respondent's misconduct in each client matter, as set forth in several ABA *Standards*.

In the Risley matter, the Hearing Board looks to ABA *Standard* 4.42, which governs Respondent's failure to abide by Risley's decision whether to settle her matter and his failure to keep her apprised of the status of her case. That standard provides for suspension when a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client. Under ABA *Standard* 4.43, public censure is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client. ABA *Standard* 4.43 governs Respondent's inattention to Risley's case, which resulted in the expiry of her statute of limitations. Finally, suspension is generally appropriate when, as here, a lawyer deceives a client in contravention of Colo. RPC 8.4(c), resulting in injury or potential injury to the client.[126]

---

**124.** A reckless state of mind is generally equivalent to "knowing" for disciplinary purposes. *In re Egbune*, 971 P.2d 1065, 1069 (Colo.1999).

**125.** *In the Matter of Pautler*, 47 P.3d 1175, 1179 (Colo.2002).

**126.** We do not apply ABA *Standard* 4.61, which calls for disbarment when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, causing the client serious injury or potentially serious injury. Although Respondent deceived Risley with an intent to

Suspension is also the presumptive sanction for Respondent's misconduct in Stringer's case. ABA *Standard* 4.42, as mentioned above, is implicated by Respondent's failure to keep Stringer informed about the status of his matter. ABA *Standard* 4.22 likewise calls for suspension when, in violation of Colo. RPC 1.6, a lawyer knowingly reveals confidential information relating to the representation of a client, and this disclosure causes injury or potential client injury. And suspension is presumed when a lawyer knowingly prejudices the administration of justice, thereby flouting Colo. RPC 8.4(d).[127]

We also take into account that in cases involving multiple types of attorney misconduct, the ABA *Standards* recommend the ultimate sanction should be at least consistent with, and generally greater than, the sanction for the most serious disciplinary violation.[128]

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

▮ Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may warrant a reduction in the severity of the sanction.[129] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction. As noted above, we begin our analysis with suspension as the presumptive sanction.

*Dishonest or Selfish Motive—9.22(b):* Respondent acted with selfish and dishonest motives in handling Risley's case. Rather than informing Risley that he had allowed her statute of limitations to expire, he involved others in his deceit by directing his staff to conceal his mistake, only serving to make matters worse through an act of dishonesty. In Stringer's case, Respondent acted selfishly by moving to voluntarily dismiss Stringer's claims without consulting Stringer himself, misconduct fueled largely by Respondent's desire for retaliation against Everette and Stringer. We consider this a significant factor in aggravation.

*A Pattern of Misconduct—9.22(c):* In both the Stringer and Risley matters, Respondent failed to communicate with his clients and acted in his own self-interest. We see in this nascent pattern a disregard of client objectives and needs when they conflict with Respondent's own purposes. Although we find troubling Respondent's apparent tendency to subordinate his clients' wishes to his own, we determine that this aggravating factor is entitled only to average weight.[130]

*Multiple Offenses—9.22(d):* In two separate client matters, Respondent engaged in multiple types of misconduct. We assign this aggravator significant weight in our sanctions analysis.

*Refusal to Acknowledge the Wrongful Nature of Conduct—9.22(g):* Although Respondent ended his time on the witness stand with a brief statement of remorse, that statement runs contrary to the rest of his testimony, including the conspiracy theory he has constructed regarding the Risley matter and the arguments he has made in support of that narrative during this proceeding.[131] His

---

benefit himself—to conceal his mistake in allowing her statute of limitations to expire—we make no finding that he thereby seriously or potentially seriously harmed her. Farry acknowledged that Risley's injuries were "minimal to moderate," implying that the monetary value of her underlying mislabeling claim was negligible.

**127.** ABA *Standard* 6.0 usually applies to violations of Colo. RPC 8.4(d), but ABA *Standard* 6.12, addressing a lawyer's knowing failure to take remedial action when material information is improperly withheld from a tribunal, is not particularly pertinent in this situation. Accordingly, we look to ABA *Standard* 7.2, which states that suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, resulting in

injury or potential injury to a client, the public, or the legal system.

**128.** ABA *Standards* § II at 7.

**129.** *See* ABA *Standards* 9.21 & 9.31.

**130.** *See In re Olsen,* 326 P.3d 1004, 1011 (Colo. 2014) (stating "we are not convinced that a single instance of prior discipline, without more, deserves greater than average weight").

**131.** *See People v. Rudman,* 948 P.2d 1022, 1027 (Colo.1997) (noting that "[w]hile the respondent *expressed* remorse ..., he steadfastly refused to see any misconduct whatsoever"); *In re Grimes,* 297 P.3d 564, 570 (Utah 2012), *reh'g denied* (Feb.

statement is also at odds with his manner and demeanor on the stand, where he went on the offensive by pointing a finger at anyone remotely implicated in these matters. The People argued in closing that Respondent has focused almost exclusively on blaming others without accepting any responsibility for his role in the events described herein, and we agree. We find especially distasteful Respondent's testimony chiding Stringer for failing to communicate with him. Accordingly, we give this aggravating factor substantial weight.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent has been a lawyer licensed in Colorado since 1988, and he practiced as a military lawyer for a few years before that. His misconduct reflects poorly on such a longstanding practitioner, and we apply this factor in aggravation.

*Absence of Prior Disciplinary Record—9.32(a):* Respondent has been practicing law in Colorado since 1988 with no instances of discipline, a fact that merits consideration in our analysis.

### Analysis Under ABA *Standards* and Colorado Case Law

The Colorado Supreme Court has directed us to exercise our discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[132] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[133] The presumptive sanction may be increased or decreased not only in light of aggravating and mitigating factors,

but also in consideration of the Colorado Supreme Court's disciplinary jurisprudence.[134] Ultimately, although prior cases are helpful by way of analogy, a hearing board should determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The People seek imposition of a one-year-and-one-day suspension, with six months served and the remainder stayed upon the successful completion of a probationary period with practice monitoring. They point us to *People v. Gaimara*[135] and *People v. Smith*[136] in support of their request.

In *Gaimara*, a lawyer engaged in a "charade" over a period of more than two years, inaccurately telling the client that there was a pending Administrative Law Judge decision in the client's case, falsely indicating that he was engaged in settlement negotiations on the client's behalf, and ultimately giving the client a check for the "settlement" that was in fact drawn from the lawyer's personal funds.[137] Considering four aggravating factors and one mitigator, as well as the lawyer's intentional state of mind, the Colorado Supreme Court imposed a six-month fully served suspension.[138] In *Smith*, a lawyer misrepresented to his client on several occasions that he had filed a lawsuit on the client's behalf; he then paid his client "settlement" funds from his personal funds and gave the client a "manufactured letter" regarding the purported settlement.[139] In light of three aggravating factors, including prior discipline, and three mitigators, the Colorado Supreme Court suspended the lawyer for a year and a day.[140]

8, 2013), as amended (Mar. 21, 2013) (finding that remorse presented for the first time at trial is irrelevant, as "remorse must generally be linked to the acknowledgment of wrongful conduct and motivation to make amends *prior* to being caught").

132. *See In re Attorney F.*, 285 P.3d 322, 327 (Colo.2012); *In re Fischer*, 89 P.3d 817, 822 (Colo.2004) (concluding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

133. *In re Attorney F.*, 285 P.3d at 327 (quoting *People v. Rosen*, 198 P.3d 116, 121 (Colo.2008)).

134. *See In re Olsen*, 326 P.3d at 1011.

135. 810 P.2d 1076 (Colo.1991).

136. 888 P.2d 248 (Colo.1995).

137. 810 P.2d at 1078–79.

138. *Id.* at 1079–80.

139. 888 P.2d at 249.

140. *Id.* at 249–50. Along with these cases, we also consider *The Florida Bar v. Palmer*, 504 So.2d 752, 752 (Fla.1987) (suspending an attorney for eight months for falsely telling a client that the case had been settled out of court, leading to the expiration of the client's statute of

Although these cases are instructive, they do not address Respondent's misconduct in the Stringer matter. For that analysis, we look to apposite cases decided by sister jurisdictions. First, we consider *Farber*, where a lawyer threatened his client in a letter and revealed confidential client information in a motion to withdraw and an accompanying affidavit.[141] This misconduct was met with a four-month suspension.[142] Also pertinent is *In re Dooley*.[143] There, a mother retained an attorney to assist with her husband's adoption of her son; during the representation, the attorney communicated about the adoption with the son's father without the mother's specific authorization to do so.[144] The attorney, who had twice previously been sanctioned for other disciplinary offenses, was suspended for thirty days.[145]

We read these authorities to counsel imposition of a relatively lengthy period of suspension, particularly because the lone mitigator cannot counteract the five aggravators, some of which we accord great weight. Given the ABA *Standards'* guidance to impose a sanction that is at least consistent with, and generally greater than, the sanction for the most serious disciplinary violation, we are all the more confident that a considerable period of suspension is warranted.[146] Indeed, viewed alone, lawyers' knowing attempts to deceive their clients in order to conceal violations of other ethical rules have resulted in

suspensions ranging from six months to one year.[147] Here, Respondent's directive to his staff to deceive Risley, coupled with his self-serving handling of Stringer's claims, warrants a one-year-and-one-day suspension; we require just nine months served, however, in recognition of Respondent's clean disciplinary record of more than twenty years. We also conclude that Respondent's attitude toward his clients—one that places his own needs above their own—demands an extensive period of probation and practice monitoring to ensure that he faithfully honors his duties of communication, loyalty, and candor to future clients. With these considerations guiding our analysis, we find that Respondent should be suspended for a period of one year and one day, nine months served and the remainder stayed upon a three-year period of probation, with conditions to include practice monitoring.

## V. CONCLUSION

The most important ethical duties are those obligations a lawyer owes to clients. Respondent violated that most basic of client-centered duties: to be truthful and candid with his client about the representation. He also disregarded his duty of confidentiality-the hallmark of the lawyer-client relationship and the wellspring of trust that clients repose in their lawyers. Respondent's failure to observe these duties justifies a one-year-

limitations, even though the attorney had no prior discipline and borrowed $10,000.00 to pay the client in apparent satisfaction of her claim). We contrast these cases with others imposing less severe sanctions; in such cases, mitigating factors significantly outnumbered aggravating factors. *See In re Gibson*, 991 P.2d 277, 277–79 (Colo.1999) (imposing a served thirty-day suspension upon a lawyer who neglected a client's case, leading to its dismissal, and who then misrepresented the status of the case to the client for four years, where three aggravators and six mitigators applied, and where the client suffered no actual harm); *People v. Kram*, 966 P.2d 1065, 1067–68 (Colo.1998) (imposing public censure, plus conditions, for lawyer who misrepresented to his client that her case had not been dismissed, given that the two aggravating factors were outweighed by six mitigating factors, including a number of significant traumatic events in the lawyer's life); *People v. Smith*, 769 P.2d 1078, 1079–80 (Colo.1989) (publicly censuring a lawyer who neglected his clients' case and made six misrepresentations to the clients about the

status of the case, in consideration of two aggravating factors and five mitigating factors).

**141.** 488 S.E.2d at 462–63.

**142.** *Id.* at 466.

**143.** 637 N.W.2d 1, 1 (N.D.2001).

**144.** *Id.*

**145.** *Id.* at 2.

**146.** ABA *Standards* § II at 7.

**147.** *See Gaimara*, 810 P.2d at 1079–80; *Smith*, 888 P.2d at 249–50. We distinguish *Gaimara*, in which a six-month suspension was imposed, to the facts present here; unlike the respondent lawyer in *Gaimara*, Respondent involved non-lawyer subordinates in his scheme to mislead the client, and he engaged in other misconduct in a separate client matter.

and-one-day suspension, with nine months served and the remainder stayed upon a three-year period of probation, with conditions to include practice monitoring.

## VI. ORDER

The Hearing Board therefore **ORDERS:**

1. **WILLIAM W. MUHR,** attorney registration number 18093, is **SUSPENDED FROM THE PRACTICE OF LAW FOR ONE YEAR AND ONE DAY, NINE MONTHS SERVED AND THE REMAINDER STAYED** upon the successful completion of a **THREE-YEAR PERIOD OF PROBATION,** subject to the conditions set forth below. The suspension will take effect only upon issuance of an "Order and Notice of Suspension." [148]

2. Within fourteen days after the effective date of the suspension, Respondent **MUST** comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia, to notification of clients and of other jurisdictions where the attorney is licensed.

3. Should Respondent wish to resume the practice of law, he will be required to submit to the People, no more than twenty-eight days prior to the expiration of the period of suspension, an affidavit complying with C.R.C.P. 251.29(b).

4. Respondent **MUST** comply with the following conditions during his three-year period of probation:

   a. Respondent must consult every month with a practice monitor selected jointly by the People and Respondent. The monitoring will be designed to implement and consistently employ effective systems for calendaring and regular communication with clients. Each monitoring session must include reviews of Respondent's client files, selected at random. Respondent must provide a copy of this opinion to the monitor and execute an authorization for release of Respondent's information to the People. The monitor must notify the People if Respondent fails to fully participate in the required monitoring. The monitor must submit regular reports to the People during the monitoring period. Respondent is responsible for bearing all costs of complying with this condition of probation.

   b. No further violations of the Colorado Rules of Professional Conduct.

5. No more than twenty-eight days and no less than fourteen days prior to the expiration of the period of probation, Respondent **MUST** file an affidavit with the People stating that he has complied with all terms of probation and shall file with the PDJ notice and a copy of such affidavit and application for an order showing successful completion of the period of probation. *See* C.R.C.P. 251.7(f). Upon receipt of this notice and absent objection from the People the PDJ will issue an order showing that the period of probation was successfully completed. *Id.* The order will become effective upon the expiration of the period of probation. *Id.*

6. If, during the period of probation, the People receive information that any condition may have been violated, the People may file a motion with the PDJ specifying the alleged violation and seeking an order that requires Respondent to show cause why the stay should not be lifted and the sanction activated for violation of the condition. *See* C.R.C.P. 251.7(e). The filing of such a motion will toll any period of suspension and probation until final action. *Id.* Any hearing will be held pursuant to C.R.C.P. 251.7(e). If Respondent's probation is revoked for any reason, he will be required to peti-

---

148. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

tion for reinstatement to the practice of law pursuant to C.R.C.P. 251.29(c).

7. The parties **MUST** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before Friday, April 3, 2015.** No extensions of time will be granted. If a party files a post-hearing motion or an application for stay pending appeal, any response thereto **MUST** be filed within seven days, unless otherwise ordered by the PDJ.

8. Respondent **MUST** pay the costs of these proceedings. The People **MUST** submit a "Statement of Costs" within fourteen days from the date of this order. Respondent's response thereto, if any, **MUST** be filed within seven days, unless otherwise ordered by the PDJ.

